IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Betty Hoskinson, Individually and as
Surviving Spouse of Ronald Hoskinson,

         Plaintiff,

      vs.                        Case No. 11-1190-JTM

High Gear Repair, Inc.,

         Defendant.


MEMORANDUM AND ORDER

While unloading his employer's anhydrous ammonia tanker trailer, Ronald Hoskinson suffered serious injuries leading to his death when he came in contact with the power take-off (PTO) shaft extending from his truck to a pump on the tanker. His surviving spouse, Betty Hoskinson, brings the present action against a small Oklahoma company, High Gear Repair, Inc., which had performed work on the tanker ten months before the accident. Because this work was entirely unrelated to the PTO shaft and pump, the court grants High Gear's Motion for Summary Judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable

doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

SKC Leasing, Dodge City Express, and Sallee, Inc. are Kansas entities which have facilities in Dodge City and Garden City, Kansas. Martin Keim is the CEO of each of these companies. SKC owns trucks and trailers, which it leases to Dodge City Express and Sallee. As of January 2013, Dodge City Express and Sallee operated 75 trucks (60 of which are owned by SKC and 15 are leased from owner-operators) and 301 trailers.

Dodge City Express hauls mostly general commodities using refrigerated trailers and dry van trailers.

As of January 2013, Sallee used 13 cargo tankers to haul liquefied gas. Sallee does business in 42 states, and has repair shops in Dodge City and Garden City. There are approximately 15 shop employees. Since 2005, Brent D. Woods has been the safety director for Sallee.

Ronald Hoskinson was hired by Sallee on January 27, 2010. He participated in a one day orientation at Sallee's Garden City office. Typically, Sallee's "oldest driver," Dave Collins, would take new hires on deliveries of anhydrous ammonia and provide on-the-job training on "all the process, safety procedures, safe unloading practices, safe loading practices, safety equipment." Woods understood from Hoskinson that Hoskinson had "between 30 and 40 years of handling that material, anhydrous ammonia, so basically he could have trained all of us how to handle it."

According to Keim, Hoskinson did not receive on-the-job training from Sallee's oldest driver. Keim believed that given Hoskinson's "experience doing the job" delivering anhydrous ammonia, Hoskinson "could have taught me. He could have taught my trainer."

At one time, for approximately two years, Hoskinson had his own auto repair shop where he performed general mechanical work on cars and trucks and rebuilt engines. Hoskinson had also worked for 7 or 8 years as a mechanic for the Renick & Reynolds farm on tractors, combines, planters and "all kinds of equipment." All of the tractors he worked on had a power take-off. Before Hoskinson was employed by Sallee, the trailers he had used to haul liquefied gas had power take-offs.

On February 19, 2009, Mark Dorris Equipment and Leasing sold to SKC a cargo tanker, Serial No. 4144454, used to transport liquefied gas. The tanker had been manufactured in 1977 by Trinity Industries of Fort Worth, Texas for Enderby-Anderson Co. of Gainesville, Texas. Sallee referred to the tanker as trailer #58 or #58A1 (hereafter "Trailer 58"). "A" is used with the trailer number when the trailer is set up to haul anhydrous

ammonia.



**Figure 1**.

Figure 1 shows the front of the trailer from the operator's perspective.

The United States Department of Transportation ("DOT") classifies ammonia as a hazardous material and requires ammonia as a liquefied gas to be transported in containers that meet DOT specifications. The design and construction standards for tankers that haul liquefied ammonia gas are found at 49 C.F.R. 178.337, Specification MC 331.

DOT requires an annual inspection for MC 331 cargo tankers, and Trailer 58 underwent an external visual inspection and leakage test in February 2009.

All liquid and vapor inlet (openings that allow the product to flow only into the tank) and outlet (openings that allow the product to flow either into or out of the tank) connections to a standard MC 331 tank are located along the centerline of the tank bottom. Under DOT regulations governing such trailers, (a) each inlet and outlet opening must be fitted with a back flow check valve or an internal self-closing stop valve located inside the cargo tank or inside a welded nozzle that is an integral part of the cargo tank, (b) a thermal

means of remote closure must be installed at or near the internal self-closing stop valve, and (c) a mechanical means of remote closure must be installed on the end of the cargo tank furthest away from the loading/unloading connection area.

On Trailer 58, a pump was used for off-loading the product. This product pump was powered by a series of drive shafts connected to a tractor's PTO output shaft. A short drive shaft was attached to the product pump. This short shaft connected by a universal joint to another drive shaft known as a jackshaft, which could telescope for connection to the tractor's PTO by means of another universal joint.

For 26 years Rocky Shaw has operated High Gear Repair, Inc. of Woodward, Oklahoma. His brother, his wife, and his son also work in the business.  High Gear performs general maintenance on trucks.

Plaintiff notes that High Gear has also converted tankers from propane to anhydrous ammonia. However, the evidence establishes that Trailer 58 was already configured to carry anhydrous ammonia before it was taken to High Gear.

High Gear has done work for Roger Sallee for approximately 15 to 20 years, working on approximately 15 trailers for Roger Sallee.  Typically, Roger Sallee would call Shaw on the phone and tell Shaw what work he wanted done on a trailer.

Roger Sallee sold his business to Keim and others in 2002. After the sale, Roger Sallee worked as an owner-operator leased to Sallee.  Shaw also continued to receive telephone work orders for work from Sallee, Inc. after the sale.

Regarding Trailer 58, Keim telephoned Shaw that "he was going to send a trailer down and wanted this plumbing changed on it."

The parties do not agree as to the nature of this plumbing change. The Plaintiff cites testimony by Keim that he told Shaw "we need to get this trailer up to—up to spec for what we do. [Shaw] was familiar he worked on a lot of our trailer[s] in the past, so we would have instructed him to get it in shape for us to haul with." Keim further testified he

wanted the trailer modified so that it could be loaded from either side rather than the rear only.

By "up to spec," Keim referred to the intended change in plumbing on the trailer, not any separate change to the PTO shaft connection to the pump. Immediately after the cited testimony, counsel asked for a clarification:

Q. Did—did you ask him to put a protective guard on the driveshaft?

A. Not that I'm aware of.

Q. Okay. And none of your trailers at that time had—

A. At that time had them, correct.

The Defendant submits that Keim's testimony is otherwise erroneous, noting first that Keim directly acknowledged that he was unable to recall if he himself spoke with Shaw, or if Sallee did. Further, all of the other evidence in the case shows that Show worked to move the loading lines from the side to the rear, not vice versa.

According to Shaw, Keim wanted to change "the internal vapor valve at the front and plumb it to both sides, and he wanted to change the load lines . . . from the side to the rear. During the conversation, he wrote out a work order during the conversation:

> MOVE REAR VAPOR LINES & VALVES TO PUMP / INSTALL INTERNAL VALVE. INSTALL & RUN CABLES TO SINGLE CONTROL – ELBOW VAPOR, SPRAY, & LIQUID LINES TO REAR OF TLR CUT CROSS-MEMBER – INSTALL BRACKETS. INSTALL VALVES – FITTINGS, CAPS & BLOW DOWNS ON ALL REAR VALVES.

The loading lines flow into inlet openings in the tank and do not connect to the pump, which is used to unload the ammonia. Thus, Shaw worked to change the trailer to allow it to be loaded from the rear. High Gear did no work in the unloading area of the trailer except to install an internal valve and plumbing for a vapor line.

Shaw has done similar plumbing work on between 1,500 to 2,000 trailers. He has never, however, worked on a trailer's PTO drive shaft, and has never installed for a customer a safety guard for a trailer's PTO drive shaft. Before Hoskinson's accident Shaw

had never seen a trailer with a safety guard for a PTO drive shaft.

Shaw uses a "workbook"—a calendar, a "daily deal"—"that I write down all the jobs that we're going to do." For each job, he creates a written work order stating what work had been ordered by the customer. He also notes any parts that were used during the work, the labor hours expended, and the work that was done. He later prepares invoices from the work orders. After an invoice was prepared, Shaw would throw away the work order because he did not have room to keep them.

A notation in Shaw's workbook reflects that Trailer 58 arrived at High Gear on March 30, 2009, and "needs plumbing." Another notation indicates that High Gear finished its work on May 4, 2009. Shaw and a helper did the work on Trailer 58, and he prepared the invoice, which indicated 21 hours in labor.



Figure 2 is a general depiction of an MC-331 cargo tank, which Shaw marked during his deposition to show the locations of the work that he performed on Trailer 58. He numbered those locations #1, #2 and #3.

At location #1, Shaw installed an internal valve for a vapor line and plumbed it to both sides of the trailer.



**Figure 3**

Figure 3 is a photograph of Trailer 58 that Shaw marked during his deposition to show the vapor line he installed.

Shaw did not work on or above the pump. He did not work on the liquid line from the tank to the pump, on the internal valve at the outlet above the pump, or on the PTO driveline to the pump.

Before Shaw worked on Trailer 58, there were three loading lines at location #2 which were plumbed to the passenger side. Following his instructions from Sallee, Shaw changed those lines so they ran to the rear of the trailer. At location #3, Shaw installed external valves for a rear loading operation.

Shaw only does work that has been ordered by the customer. It is uncontroverted that the customer for Trailer 58 gave no instructions regarding work on the PTO. Shaw had no understanding he was to "do anything to the power take-off." It is uncontroverted that, even if a customer had asked him to fabricate and install a PTO safety guard, Shaw would have declined the work, because that would be a "safety issue" that High Gear would not

"have anything to do with" because it has "no guidelines for those."

Shaw has no expertise regarding safety guards for a PTO drive shaft. He was not aware of any "safety standards or regulations that require a power take-off to have a guard." He has never attended a course or a seminar that addressed guards for power take-offs.

In her Response, Plaintiff cites the testimony of her retained expert, Dennis Guenther, who notes that the Truck Trailer Manufacturers Association has recommended the placement of guards around trailer drive shafts. It is uncontroverted, however, that defendant High Gear is not a manufacturer or seller of tanker trailers. Guenther expressly stated in his deposition that he has no opinion as to whether High Gear had any responsibility to install a guard on the drive shaft of Trailer 58.

Before the accident, High Gear did not provide any services to customers to train or instruct about the dangers of a power take-off or about OSHA PTO regulations for a power take-off. High Gear was not in the business of selling MC 331 cargo tankers, and did not sell the tanker involved in the accident. Sallee had not contracted with High Gear to perform annual cargo tanker inspections required by DOT regulations.

Trailer 58 was subjected to additional work after it left High Gear. A repair order dated May 27, 2009 indicates work done by Sallee at its own repair facility. The repair order indicates that the work included the replacement of the trailers hubs, wheel seals, wheel bearings, and wheel studs; replacement of the brakes and brake drums; installation of eight used tires; installation of an interlock valve, manifest holder and mud flaps; and eleven gallons of paint for refinishing the tank. According to Keim, this work was "a whole bunch of work just to make the trailer safer and more durable . . . to ensure an old trailer was—was very operational."

Another repair order, dated June 26, 2009, indicates work done by Bob Dailey, supervisor for Sallee's Dodge City, Kansas maintenance shop. Dailey changed the bearings

and seals on the pump; built a driveline for the pump; and installed new smart hose and vapor hose. In performing this work, Dailey replaced the existing power take-off drive shaft attached to the pump. The parts list for the repair order included six yokes, three u-joints, a bearing carrier, a three-foot shaft, a three-foot tube, and a 21-inch shaft. Dailey used these parts to build the replacement PTO drive shaft for Trailer 58.

Prior to Hoskinson's accident, the pump on each of Sallee's thirteen cargo tankers was powered by a drive shaft connected to a truck's PTO. Trailer 58, like all of Sallee's thirteen cargo tankers, had an open drive shaft without a safety guard.

Sallee had a "Comprehensive Operating Procedure Pressure Tank Product Transfer Procedure." The original version of the Procedure was written by Roger Sallee. Brent Woods modified the document.

This Procedure was in effect when Hoskinson was employed by Sallee. Woods participated in Hoskinson's job orientation at Sallee. During the job orientation, Hoskinson was given the Procedure, and the Procedure was discussed. According to Woods, the Procedure was also "part of the truck permit book, the truck manual that's kept in the truck."

On the first page of the Procedure, centered below the title of the document, was the following message:

> **YOUR SAFETY IS PARAMOUNT**: Remember the hose is the weak link in the delivery chain - **DO NOT STRADDLE HOSES**. Clothing can be caught up in an open shafted **PTO. DO NOT STAND NEXT TO OR IN LINE WITH THE PTO SHAFT**.

(All emphasis in original.)

The Procedure enumerated sequential steps for the transfer of product from a cargo tanker to a customer's storage tank. Before transferring the product, Step # 8 of the Procedure instructed the operator to "hook up PTO shaft." With the tractor's PTO disengaged and the its engine shut down, the operator then connects the jackshaft to the tractor's PTO output stub shaft. Step # 8 then instructs the operator to "open Fisher valve,"

which was the cargo tanker's internal self-closing stop valve on the outlet above the product pump.



**Figure 4**

Figure 4 shows the equipment used to off-load ammonia. The photo depicts the Fisher valve, its operating lever, the pump and the post-accident guard for the PTO shaft. This photo was taken from the driver side of the trailer. The operating lever on the Fisher valve is in the down (or open) position.



**Figure 5**

Figure 5 shows the Fisher valve operating lever in the open position, and the PTO shaft without the guard.



**Figure 6**

Figure 6 shows the Fisher valve operating lever in the closed position, and the PTO shaft without the guard.



**Figure 7**

Figure 7 shows the Fisher operating lever when the internal valve is open, and the proximity of the lever to the PTO shaft without the guard.

When the internal valve above the product pump is closed, a spring-loaded assembly seats a pin into an indentation in the operating lever, which locks the lever in the closed position.

To open the internal valve above the product pump, the set pin must be retracted and the operating lever must be forced down. When the operating lever for the internal valve above the product pump is moved down to open the valve, the set pin, under spring tension, is designed to extend forward.

When the internal valve above the product pump is open, the operating lever for the internal valve is under spring tension toward the closed position, and the operating lever is positioned below and in tension against the set pin.

At Step # 11 of the Procedure, the operator starts the tractor engine and engages the tractor's PTO to start the transfer of product from the cargo tanker to the customer's

storage tank.

After the anhydrous ammonia is transferred to the customer's storage tank, Step #14 instructs the operator to "close internal valve," which was the cargo tanker's internal valve—the "Fisher valve"—on the outlet above the product pump.

To close the internal valve above the product pump, the set pin must be retracted and then the operating lever, as designed, returns under spring tension to the closed position.

On Trailer 58, the internal stop valve for the liquid outlet connection was equipped with two manually-operated remote shutdown stations at diagonally opposite ends of the tank. The spring-loaded mechanism that retracts the set pin is designed to be cable operated from either shutdown stations. When the handle at a remote shutdown station is pulled, the set pin retracts, causing the valve to close.

Sallee trains its operators to use the remote shut down stations to close the internal valve above the pump. According to Woods, on all of Sallee's cargo tankers, the "shutoff valves are normally located as far – they should all be located in the same areas, so that if you switch trailers, you should go to the same location, be able to shut it down."



**Figure 8**



**Figure 9**

Figures 8 and 9 show the remote shutdown stations on, respectively, the passenger and driver sides of the trailer.

When a remote shutdown station is not used, and the operator uses the Fisher lever, he or she would need to force the lever down to relieve the force of the lever against the set pin, and then pull on the loop of the spring-loaded assembly to retract the set pin.

Step # 18 of the Procedure instructs the operator to "disengage PTO and put up shaft." At this step, before the jackshaft was disconnected from the tractor's PTO, the operator would typically shut down the tractor's engine and close the internal valve on the outlet above the product pump. The operator then would disconnect the jackshaft from the tractor's PTO output stub shaft. The operator then places the jackshaft in a hangar on the trailer for travel.

On March 10, 2010, Sallee dispatched Hoskinson to deliver anhydrous ammonia to a storage tank at Cox Farms, approximately 10 miles north of Sublette, Kansas, using Trailer 58. At or around 8:00 to 8:30 p.m., while at Cox Farms, Hoskinson was injured when he came into contact with Trailer 58's PTO drive shaft while on its passenger side.

At the time of the accident, the anhydrous ammonia had been transferred to the customer's storage tank, and Hoskinson was trying to close the internal valve above the product pump. Hoskinson extended his right arm into an area to the right of the product pump and above the PTO drive shaft, when the right sleeve of his jacket got caught on the shank screw of the PTO drive shaft pulling his arm into the shaft.

At the hospital in Garden City, Hoskinson told his son that he "made a high speed fuckup," explaining "that it was cold that night and he started to get out [of the truck] and he got back in an put on his jacket; and when he reached in to push that Fisher lever down, that square shank set screw that they had put on that driveshaft caught the sleeve of his jacket."

Keim visited Hoskinson on at least two occasions at the hospital in Wichita. He testified:

> Q. Did you have any conversations with Mr. Hoskinson about how the accident occurred?
>
> A. Nothing that I could really quote.
>
> Q. Did he tell you that he knew better and should not have reached for the valve from the passenger side?
>
> A. Yes.

Woods spoke to Mr. Hoskinson at the hospital in Wichita. Hoskinson told Woods that he had made a serious mistake, and that as "he tried to shut off the valve, he reached through the driveshaft and the driveshaft caught him, caught his coat."

*Conclusions of Law*

The plaintiff advances claims for negligence, strict liability, failure to warn, and breach of implied warranty of fitness for a particular purpose. (Dkt. 106, at 14-19). In its Motion for Summary Judgment, High Gear argues that its contractual relationship extended only to Sallee, Inc., and thus whether it had any duty to Hoskinson is a separate

question of law for the court. *See Robbins v. City of Wichita*, 285 Kan. 455, 460, 172 P.3d 1187 (2007) ("

High Gear advances three arguments. First, it was not responsible for Hoskinson's injuries under negligence or any common law theory, because there was no "special relationship" between itself and Hoskinson, and because it did not undertake to protect him against injury as reflected in Restatement (Second) of Torts, § 324A. Second, it argues the claims for strict liability or breach of warranty have no application because it was not a seller of the product or in its chain of distribution. *See Stephenson v. Honeywell International*, 703 F.Supp.2d 1250, 1261 (D. Kan. 2010) ("Kansas courts have recognized strict liability and implied warranty claims only in the context of the sale of a product"). Third, High Gear contends that Sallee, Inc., had a absolute duty to maintain a safe working environment for its workers, and the actions of Sallee in rebuilding the PTO and liquid product pump are intervening or superseding cause of the accident.

Because the plaintiff's Response agrees that her claim is not premised on the existence of any "special relationship" between the decedent and High Gear, the plaintiff's common law claims depend upon the application of Restatement (Second) of Torts § 324A. Section 324A, which was adopted by the Kansas Supreme Court in *Schmeck v. City of Shawnee*, 232 Kan. 11, 27, 651 P.2d 585 (1982), provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > i. His failure to exercise reasonable care increases the risk of such harm, or
> >
> > ii. He has undertaken to perform a duty owed by the other person

to the third person, or

    iii.   The harm is suffered because of reliance of the other or the third person upon the undertaking.

The court finds that summary judgment is appropriate as to the plaintiff's common law claims for two reasons. First, the plaintiff has failed to show that High Gear undertook to perform work to protect the decedent, as required under Section 324A. *See Calwell v. Hassan*, 260 Kan. at 784, 925 P. 2d 422 (1995). Such undertakings are not commonly found. *See South v. McCarter*, 230 Kan. 85, 109 , 119 P.3d 1 (2005) (noting that "in most cases we have not found an undertaking sufficient to give rise to a duty"). A defendant is not "liable [under Section 324] for a task he did not agree to assume." *Anderson v. Scheffler*, 248 Kan. 736, 742, 811 P.2d 1125 (1991).Ad 430 (1994).

Here, Sallee hired High Gear to change how Trailer 58 was loaded, not how it was unloaded. The only work High Gear did which related to the unloading of the trailer was the installation of additional vapor lines, which do not affect the method of unloading liquid product from the tanker. High Gear's plumbing work did not change how the operator used the tanker for delivering anhydrous ammonia to customers. High Gear did not do anything with respect to the PTO shaft or liquid product pump because it was not engaged to do so. Sallee's owner explicitly acknowledges that he only wanted the trailer capable of hauling anhydrous ammonia, and that he did not ask High Gear to put any guard on the PTO shaft.

Second, even if High Gear had made such an undertaking, summary judgment is appropriate under Section 324A because High Gear's work did not increase the risk of harm to Hoskinson, Sallee did not delegate its duty to protect its workers to High Gear, and Hoskinson did not rely on High Gear's supposed undertaking. As noted earlier, the facts show that High Gear's work did not affect the method for, or dangers of, delivering liquid product. Sallee, Inc.'s explicit unloading procedures were the same, before and after

High Gear's work on Trailer 58. Because High Gear did not make any "physical change" or "material alteration" to the area around the PTO shaft or liquid product pump, it is not liable under Section 324A. *See Deines v. Vermeer Mfg. Co.*, 752 F. Supp. 989, 995 (D. Kan. 1990), aff'd 969 F.2d 977 (10th Cir. 1992).

Further, there is no evidence that Sallee, Inc. delegated to High Gear its absolute duty under Kansas law to provide a safe working environment to its employees. *See* P.I.K. Civ. 4th 107.51. Nor is there evidence that Hoskinson relied on any undertaking by High Gear. Rather, the evidence shows that Hoskinson was an extremely knowledgeable operator of anhydrous ammonia equipment, with some 30 to 40 years of experience. Hoskinson was familar with Sallee, Inc's procedures for the safe handling of anhydrous ammonia. Hoskinson essentially could have trained everyone else at Sallee how to do the job. Moreover, Sallee, Inc., is a sophisticated business entity, which operates 75 trucks and 301 trailers (including thirteen cargo tankers) in 31 states. Its mechanical shops employ 15 persons.

Here, the plaintiff does not controvert that Sallee and Ronald Hoskinson were sophisticated users and operators of anhydrous ammonia cargo tankers. Nor does the plaintiff dispute that Sallee gave an adequate written warning to its employees about working near the unguarded PTO shaft. The PTO shaft was an open and obvious hazard, and accordingly the plaintiff cannot show any reliance by Hoskinson on the actions of High Gear. *See Hartman v. Miller Hydro Co.*, 499 F.2d 191, 194 (10th Cir. 1974).

The plaintiff's opposition to the motion for summary judgment depends almost exclusively on argument by counsel rather than evidence in the record. Thus, the plaintiff repeatedly asserts that High Gear's work was a "conversion" rather than a repair, but the facts do not support this conclusion. As noted above, Trailer 58 was already configured to carry anhydrous ammonia, and High Gear simply changed to plumbing on the tanker to allow for rear loading. It did nothing with respect to the PTO shaft or liquid pump for

unloading the ammonia.

Similarly, the plaintiff repeatedly asserts that High Gear installed "a new plumbing system" on the trailer, without supplying any evidence for the assertion. This argument attempts to gloss over the fact that High Gear changed the plumbing system for *loading* the trailer, which is performed without reliance on the pump. High Gear made no material modifications to the system for *unloading* the tanker.

Finally, the plaintiff asserts that High Gear's work somehow changed the "work area" where the operator stood to perform the unloading. Again, however, this is simply argument by counsel; it is not reasonably founded on any evidence. The plaintiff introduces no evidence showing that the operator's work area changed, relying instead on confusion of loading and unloading operations. The frequent repetition of an argument by counsel is not a substitute for a fact.

And the plaintiff's argument is indeed contradicted by the facts. The Sallee procedure for unloading ammonia was the same, both before and after the High Gear work. That work centered on how the trailer was loaded, not how it was unloaded. Thus, High Gear did not work on any of the liquid-handling equipment which was involved in the accident — the Fisher valve, the pump, the power takeoff driveshaft, or the external valve for the liquid line.

Under the Sallee procedure, the operator connects a hose from the external valve on the liquid line below the pump to the customer's tank, and opens the Fisher internal valve above the pump. This starts the product flow from the tank. From inside the truck, the operator engages the PTO to start the pump. The operator stops the pump using the remote shutdown handles at either end of the trailer. The operator disengages the PTO from inside the truck. High Gear's work altered nothing in these procedures, and in no way affected either the location or danger to the operator.

With respect to the claims sounding in product liability, the plaintiff agrees that

"this is not a manufacturing case," and that as a result, neither K.S.A. 60-3301 et seq. or Restatement (Second) of Torts § 402A are applicable. (Dkt. 98, at 1, 20). She asserts, however, that these claims remain valid under the Restatement (Second) of Torts § 395.

However, § 395 by its express terms applies only to "[a] manufacturer who fails to exercise reasonable care in the manufacture of a chattel." The plaintiff's concession that "this is not a manufacturing case" is as fatal to a claim under § 395 as it is to one under § 402A. The uncontroverted facts fail to show that the defendant "manufactured" any trailer component involved in the accident, and accordingly the plaintiff's claims must be dismissed.

As Judge Lungstrum noted in *Stephenson v. Honeywell International,* 703 F.Supp.2d 1250, 1261 (D. Kan. 2010), "Kansas courts have recognized strict liability and implied warranty claims only in the context of the sale of a product." In Kansas, "strict liability requires a defect at the time of the sale of the product." *Id.* (citing and quoting *Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 755, 861 P.2d 1299, 1310–11 (1993) ("[a] negligence analysis is more appropriate than an application of strict liability in the post-sale context")).

*Stephenson* is directly analogous here. In that case, plaintiff brought suit following an airplane crash. The court held that strict liability theories were not applicable to the defendant, who had repaired the engine, replacing some of its worn parts. The plaintiff attempts to distinguish *Stephenson* on the grounds that in that case the defendant was a "mere repairer" of the engine, while High Gear performed substantially more work on the Trailer 58.

This attempted distinction fails under the facts, however. The evidence shows that, as to the components of the trailer involved in the accident – the PTO shaft and liquid product pump – High Gear performed *no* work. As to those components, High Gear was not even a "mere repairer." In any event, the court follows *Stephenson* and holds that, given

the post-sale nature of the product, Kansas law limits the plaintiff's claims to those sounding in neligence.

Finally, the court finds that it need not resolve the issue of intervening or superseding cause. High Gear presents a strong argument that such a cause exists in Sallee, Inc.'s extensive work on and replacement of the PTO shaft and liquid product pump, and thus that High Gear's repair work months earlier was therefore not the proximate cause of the accident. *See Puckett v. Mt. Carmel Reg. Med. Center*, 290 Kan. 406, 228 P.3d 1048 (2010) (discussing elements of legal causation). However, the issue of intervening causation "'does not come into play until after causation in fact has been established.'" *Id.* (quoting *Waste Management v. South Central Bell*, 15 S.W.3d 425, 432 (Tenn. App. 1997). Here, for the reasons stated earlier, the plaintiff here has failed to show that High Gear's work was the cause in fact of the accident. Thus, while High Gear's intervening cause argument has some support in the facts, the the court need not resolve the issue.

IT IS ACCORDINGLY ORDERED, this 12th day of November, 2013, that the defendant's Motion for Summary Judgment (Dkt. 81) is hereby granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE